937 F.2d 641
 33 ERC 1393, 290 U.S.App.D.C. 323, 60
USLW 2040,
21 Envtl. L. Rep. 21,231
 NATURAL RESOURCES DEFENSE COUNCIL, INC., and Sierra Club, Petitioners,
v.
U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., Respondents,
Peabody Holding Company, Inc., et al., Natural Resources
Defense Council, Inc., et al., American Mining
Congress, et al., National Coal
Association, et al., Intervenors.
SIERRA CLUB, Petitioner,
v.
U.S. ENVIRONMENTAL PROTECTION AGENCY and William K. Reilly,
Administrator, Respondents,
National Coal Association, American Mining Congress, Intervenors.
 Nos. 84-1629, 90-1028.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 25, 1991.
Decided June 28, 1991.
As amended June 28, 1991.
 
 Petition for Review of an Order of the Environmental Protection Agency.
 Howard I. Fox, with whom David D. Doniger, was on brief, Washington, D.C., for E.P.A., Natural Resources Defense Council, Inc., and Sierra Club in Nos. 84-1629 and 90-1028. Joseph J. Brecher, Oakland, Cal., also entered an appearance, for petitioners.
 Craig D. Galli, Atty., Dept. of Justice, with whom Richard B. Stewart, Asst. Atty. Gen., Barry M. Hartman, Deputy Asst. Atty. Gen., Gregory B. Foote, Atty., E.P.A., and Alice L. Mattice, Atty., Dept. of Justice, were on brief, Washington, D.C., for respondents in both cases. Roger J. Marzulla, George B. Henderson, II and Stephen L. Samuels, Attys., Dept. of Justice, Jill E. Grant and Sara Schneeberg, Attys., E.P.A., also entered appearances, Washington, D.C., for respondents.
 Andrea Bear Field, with whom Michael B. Barr, Washington, D.C., and Lee B. Zeugin, Richmond, Va., for Nat. Coal Ass'n, James R. Bieke and Frederick C. Schafrick, Washington, D.C., for Peabody Holding Co. and Peabody Coal Co., Paul D. Phillips, Adelia S. Borrasca and Edward M. Green, Washington, D.C., for American Min. Congress, et al., were on brief, for industry intervenors-petitioners in No. 84-1629. Charles D. Ossola, J. Peter Luedtke, David C. Branand and Larry A. Boggs, also entered appearances, Washington, D.C., for intervenors.
 Before BUCKLEY, WILLIAMS and RANDOLPH, Circuit Judges.
 Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.
 STEPHEN F. WILLIAMS, Circuit Judge:
 
 
 1
 Surface coal mining operations throw up dust. This "fugitive dust"[1] comes primarily from traffic on unpaved "haul roads" and from wind erosion, see "Requirements for Implementation Plans: Surface Coal Mines and Fugitive Emissions", 54 Fed.Reg. 48,870, 48,879/2 (1989), and it accounts for virtually all of the air pollution generated at surface coal mines, id. at 48,875/2. We deal here with a decision of the Environmental Protection Agency concluding that such fugitive emissions should not count in identifying facilities that are so "major" as to trigger application of the Clean Air Act's provisions on "prevention of significant deterioration" ("PSD"), Secs. 160 et seq., 42 U.S.C. Secs. 7470 et seq. (1988).
 
 
 2
 The PSD provisions impose stringent permit requirements on construction of any new "major emitting facility" in an area that has attained compliance with national ambient air quality standards. Sec. 165, 42 U.S.C. Sec. 7475 (1988); see also Sec. 169(2)(C), 42 U.S.C. Sec. 7479(2)(C) (1988) (defining "construction" to include modification of an existing source). The Act defines such facilities as plants of certain listed types that produce 100 tons or more of any air pollutant per year, together with "any other source with the potential to emit two hundred and fifty tons per year or more of any air pollutant." Sec. 169(1), 42 U.S.C. Sec. 7479(1) (1988). Most surface coal mines of economically viable size have the potential to emit more than 250 tons of dust. See "Requirements for Preparation, Adoption and Submittal of Implementation Plans", 49 Fed.Reg. 43,211, 43,212/1 (1984).
 
 
 3
 In Alabama Power Co. v. Costle, 636 F.2d 323, 369-70 (D.C.Cir.1979), however, we held that Sec. 169(1)'s definition of "major emitting facility" was limited by the Clean Air Act's generic definition, Sec. 302(j), 42 U.S.C. Sec. 7602(j) (1988), which reads as follows:
 
 
 4
 Except as otherwise expressly provided, the terms "major stationary source" and "major emitting facility" mean any stationary facility or source of air pollutants which directly emits, or has the potential to emit, one hundred tons per year or more of any air pollutant (including any major emitting facility or source of fugitive emissions of any such pollutant, as determined by rule by the Administrator [of the EPA].
 
 
 5
 Id. (emphasis added).[2] The result, we held in Alabama Power, is that calculation of Sec. 169(1)'s 250-ton threshold "may include fugitive emissions only as determined by rule by the Administrator." 636 F.2d at 370. The primary issue before us is the scope of the Administrator's authority in making that determination.
 
 
 6
 In 1984 EPA promulgated a list of 27 categories of industrial stationary sources for which fugitive emissions are to be included in determining whether a source is "major". See "Requirements for Preparation, Adoption and Submittal of Implementation Plans", 49 Fed.Reg. 43,202, 43,208-10 (1984). It simultaneously issued a companion notice proposing to add surface coal mines to the list. See id. at 43,211. In the end, it declined to add them, see 54 Fed.Reg. at 48,870, relying primarily on a finding that the socioeconomic costs of regulating the mines would outweigh any environmental benefits, id. at 48,879/3. The petitioners argue that cost-benefit is not the right standard, and that in any event, it would, if correctly applied, require EPA to count coal mines' fugitive emissions when identifying major emitting facilities, at least in some circumstances.
 
 
 7
 We find EPA's construction of the relevant statutory language permissible, and we uphold its application of cost-benefit analysis.
 
 
 8
 * * *
 
 
 9
 The petitioners claim that Congress clearly expressed an intent in Sec. 302(j) to impose a nondiscretionary duty on EPA to subject all sources of fugitive emissions to the full panoply of PSD and nonattainment requirements. In their view, the provision's "by rule" requirement contemplates nothing more than the simple ministerial task of determining which sources have the potential to emit more than the threshold limit. See 49 Fed.Reg. at 43,206/1. As surface coal mines concededly fall within this category, they claim that EPA must subject them to the permit requirements of the PSD rules.
 
 
 10
 Not surprisingly, petitioners do not stress the language of Sec. 302(j). It appears to constrain the Administrator's discretion only by requiring that he act "by rule". Petitioners instead point to four passages from a House committee report (accompanying its version of the bill that led to the 1977 amendments), which in their view expressed Congress's "intention on the precise question at issue", Chevron U.S.A. v. NRDC, 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 2782 n. 9, 81 L.Ed.2d 694 (1984). We find nothing remotely approaching such an expression of intent.
 
 
 11
 1. In summarizing the changes to be wrought by the proposed amendments, the House Committee observed that
 
 
 12
 the "major stationary source" definition is clarified to indicate the inclusion of major sources of fugitive emissions (last year's bill was unclear in this respect).
 
 
 13
 H.Rep. No. 294, 95th Cong., 1st Sess. 4 (1977), U.S.Code Cong. & Admin.News 1977, pp. 1077, 1081 ("House Report"), reprinted in 4 Legislative History of the Clean Air Act Amendments of 1977 (Committee Print) at 2471 ("Leg. Hist."); see also id. at 2905 (text of the precursor of Sec. 302(j)). Of course, no one disputes that the new definition of "major stationary source" included language on fugitive emissions. The question is what it meant--whether the EPA Administrator was authorized to "determine" under what circumstances such emissions should be included, or only to perform some technical task; the cited passage provides not a clue.
 
 
 14
 2. The House report made reference to Sec. 169(1)'s explicit authority for states to exempt nonprofit educational and health institutions that would otherwise qualify as "major" emitting facilities. See House Report at 144-45, U.S.Code Cong. & Admin.News 1977, pp. 1223, 1224, reprinted in 4 Leg. Hist. at 2611-12; see also House Committee Print No. 15, 95th Cong., 1st Sess. 9 (1977), reprinted in 4 Leg. Hist. at 3393. Petitioners argue that this "enumeration of specific regulatory exemptions" precludes the implication of others. But the issue is EPA's authority, not the states', and EPA is applying Sec. 302(j), as construed in Alabama Power, not Sec. 169(1). Further, EPA claims not that Congress exempted coal mines, but only that Congress gave EPA discretion whether to include them (and other sources of fugitive emissions).
 
 
 15
 3. The House bill contained a provision authorizing a state's governor to exclude "naturally occurring particulate matter" from the computation of an area's compliance with the emission ceilings permitted by the PSD that come into play once a major emitting facility is licensed.[3] See House Report at 402-03, reprinted in 4 Leg. Hist. at 2869-70. Of course, this provision does not relate to the distinct problem of inclusion of fugitive emissions for purposes of the definition of a major emitting facility. Moreover, it did not survive. While in existence, however, it served as grist for the committee's defense to claims that the amendments would limit the size or operation of large surface coal mines:
 
 
 16
 "Naturally occurring particulate matter" includes dust resulting from wind erosion of fields, farms, or open strip mines prior to or during reclamation. (Of course, the committee does not intend to exempt particulate emissions resulting from the mining process itself, dust created by moving vehicles, or from other coal-processing related activities.)
 
 
 17
 House Report at 165, U.S.Code Cong. & Admin.News 1977, p. 1244, reprinted in 4 Leg. Hist. at 2632.
 
 
 18
 Petitioners grasp at the parenthetical as evidence that the Administrator's Sec. 302(j) authority is not as broad as it appears. But the committee's recognition that this aborted gubernatorial authority did not itself exempt surface coal mines is quite consistent with the Administrator's understanding of his authority to define the circumstances when fugitive emissions are to be included in the definition of a major emitting facility.
 
 4. Finally, the House committee stated that
 
 19
 the ultimate decision on whether to classify the lands or to grant a permit to a proposed strip mine will rest with the State, just as it does with other proposed sources.
 
 
 20
 House Report at 166, U.S.Code Cong. & Admin.News 1977, p. 1245, reprinted in 4 Leg. Hist. at 2633. The petitioners read this passage as grouping surface coal mines with the categories of industrial sources expressly made subject to PSD requirements by Sec. 169(1). Again, they ignore context. Responding to concerns over the effects of the proposed bill on energy resources, the committee was discussing the availability of various sources of state flexibility. It noted the ill-fated gubernatorial authority to exclude naturally occurring particulate matter and the states' authority to reclassify affected lands to allow a higher increment.[4] The passage contains no discussion of the conditions under which surface coal mines (or other fugitive emission sources) would in fact be subject to PSD requirements. It simply argues that even if mines are listed, they will still be feasible by virtue of authorities granted the states.
 
 
 21
 Thus, while the statutory language and legislative history do not bar petitioners' construction, they provide little support and no necessity for it. In fact, if petitioners are correct that the only prerequisite to PSD regulation is a determination that an industry's plants might pollute more than the threshold limit, one wonders why Congress thought it necessary to force EPA through burdensome rulemaking hoops--what issues did it expect to be illuminated by public participation?
 
 
 22
 We must next determine whether the agency's construction is a permissible one. Chevron, 467 U.S. at 845, 104 S.Ct. at 2783. EPA concluded that Congress intended it to make two findings before requiring inclusion of fugitive emissions in the threshold applicability determinations for sources in a particular category: "(1) That the sources have the potential to degrade air quality significantly and (2) that no unreasonable socioeconomic impacts relative to the benefits would result from subjecting the sources to [PSD requirements]." 49 Fed.Reg. at 43,208/1.
 
 
 23
 As we noted above, Congress placed no explicit constraints on the rulemaking discretion of the EPA Administrator; he is to act "as [he] determine[s]". Nor is the issue addressed in the legislative history. So long as the agency construction represents a reasonable accommodation of conflicting congressional policies, see Chevron, 467 U.S. at 845, 104 S.Ct. at 2783, we must defer. That standard is easily met here.
 
 
 24
 The purposes of the PSD provisions of the Clean Air Act include:
 
 
 25
 (3) to insure that economic growth will occur in a manner consistent with the preservation of existing clean air resources ... [and]
 
 
 26
 (5) to assure that any decision to permit increased air pollution in any area to which this section applies is made only after careful evaluation of all the consequences of such a decision....
 
 
 27
 Section 160, 42 U.S.C. Sec. 7470 (1988) (emphasis added). Nothing in the legislative history undermines the inference that Congress believed that its PSD provisions should balance the values of clean air, on the one hand, and economic development and productivity, on the other, and much confirms it. See, e.g., House Report at 163, U.S.Code Cong. & Admin.News 1977, p. 1242, 4 Leg. Hist. at 2630; S.Rep. No. 127, 95th Cong., 1st Sess. 29 (1977), 3 Leg. Hist. at 1403. In Alabama Power we said, "[Section 302(j) ] may be welcomed as serendipitous, for it gives EPA flexibility to provide industry-by-industry consideration and the appropriate tailoring of coverage." 636 F.2d at 369. The EPA construction of Sec. 302(j) thus fits the statutory language, the overall congressional purposes, and our prior understanding of Sec. 302(j)'s role.
 
 
 28
 EPA's approach seems especially appropriate for extractive industries. The idea of special rules for prevention of significant deterioration was born from a fear that polluters might avoid air quality regulations by relocating their plants to pristine areas where ambient pollution levels were well below statutory ceilings. See House Report at 151, U.S.Code Cong. & Admin.News 1977, p. 1230, reprinted in 4 Leg. Hist. at 2618 ("there is a strong national interest in not encouraging industries to go forum shopping, seeking to locate new plants in areas which allow the greatest pollution"). The extractive industries pose such a fear only indirectly, as one may extract a mineral deposit only where one finds it. Compare 49 Fed.Reg. at 43,212/2. While air-related controls over surface coal mines will at the margin tend to increase underground mines' share of total coal production, thus in a sense shifting the locale of coal production, the impact of exclusion from PSD treatment is less direct than for more mobile industries.
 
 
 29
 Finally, EPA's decision not to list surface coal mines under Sec. 302(j) hardly means that their operators are free to pollute at will. As EPA noted, they remain subject to other Clean Air Act limitations (e.g., national ambient air quality standards and, in areas in which the PSD baseline has been triggered, PSD increment limitations) and, more importantly, to the authority of the Department of Interior under the Surface Mining Control and Reclamation Act and other provisions, see 54 Fed.Reg. at 48,875/2, a matter discussed more fully below. The agency construction of Sec. 302(j) is reasonable.
 
 
 30
 * * *
 
 
 31
 The petitioners urge that even if cost/benefit analysis is appropriate under Sec. 302(j), EPA's application of its chosen methodology was flawed. EPA posited four basic alternatives:
 
 
 32
 Alternative I: The status quo; no listing.
 
 
 33
 Alternative II: Listing for surface coal mines, but with a proviso that emissions from existing mines would not count toward consumption of the permitted increments, i.e., a kind of grandfathering of existing mines.
 
 
 34
 Alternative III: Listing of surface coal mines, with no exclusion of emissions from existing mines.
 
 
 35
 Alternative IV: Listing of surface coal mines only to the extent that they have an impact on air quality in the most highly protected of the various classes into which regions are sorted for PSD purposes, Class I areas and "mandatory" Class II areas (which, unlike other class II areas, states may not reclassify into Class III areas).
 
 
 36
 See 54 Fed.Reg. at 48,872-73. In its Regulatory Impact Analysis, EPA assessed the costs and benefits of the three regulatory alternatives against the baseline of no regulation. See II J.A. at 586-633. It concluded that the costs of Alternatives II and III greatly outweighed their benefits. See 54 Fed.Reg. at 48,873/2. On this score it pointed to the relatively low background ambient pollution levels in the remote areas where surface coal mines are generally located, the limited distance from the mine that ambient impacts occur, and the general absence of population centers exposed to surface coal mine particulate matter. Id. Petitioners appear not to contest these conclusions.
 
 
 37
 The Regulatory Impact Analysis found the evaluation of Alternative IV inconclusive, estimating that it might have anywhere from a $300,000 net advantage to a $300,000 net detriment for the two sample areas considered. II J.A. at 623-24. This did not include certain hard-to-value benefits that the extra regulation might afford. Id. EPA noted, however, that the study failed to consider the effects of Department of Interior regulation of surface coal mining, and concluded that Alternative IV was not cost justified, noting that regulation by Interior would achieve "many if not all of the visibility and other benefits" of inclusion. 54 Fed.Reg. at 48,873/3.
 
 
 38
 The petitioners have two complaints: (1) that EPA "double-counted" a substantial part of the costs of listing surface coal mines among the sources for which fugitive emissions count in identifying major emitting facilities; and (2) that EPA's reliance on the regulatory muscle of the Department of Interior was inappropriate since that agency's authority is not as broad as EPA's PSD authority.
 
 
 39
 EPA's cost-benefit study assumed that surface coal mines would have to comply with PSD increments only if EPA listed the mines under Sec. 302(j). This is not necessarily true. Although the PSD rules are triggered only by a major source, they require control--to keep the affected area within permissible PSD "increments"--of any source. Alabama Power, 636 F.2d at 361-64. Thus, even with surface coal mines not listed, states will be under an obligation to control them whenever some other source, such as a power plant, has sprung the trigger. It follows, say petitioners, that EPA underestimated the costs of Alternative I. With a correct count, they infer, EPA might have found Alternative IV preferable.
 
 
 40
 EPA invokes exhaustion,[5] noting that petitioners failed to raise the issue in the rulemaking. Petitioners respond with dictum from our decision in NRDC v. EPA, 824 F.2d 1146 (D.C.Cir.1987) (en banc), to the effect that the court "has excused the exhaustion requirements for a particular issue when the agency has in fact considered the issue." Id. at 1151 (citing cases where the litigant raises an issue that another participant had raised before the agency). Petitioners point to the following, a footnote in the Regulatory Impact Analysis, to show that EPA did consider the matter:
 
 
 41
 It should be noted that PSD increments for PM can be imposed on mines even under Alternative I, pursuant to which SCMs are not required to obtain PSD permits.... This, of course, considerably decreases the difference in impact between Alternative I and listing. This is not directly addressed by this study because of great uncertainty about how many mines would be affected.
 
 
 42
 II J.A. at 627 n. 3.
 
 
 43
 We do not think it necessary to explore when or to what extent an agency's spontaneous consideration of an issue excuses want of exhaustion. First, quite apart from the factual issue of whether other major emitting facilities have triggered (or are likely to trigger) the PSD requirements in any significant number of areas where firms may seek to open surface coal mines, there appears no reason to think that the point would affect the net cost-benefit analysis. Application of the PSD increments entails not only the costs of that regulation but its benefits. Petitioners make no assertion that the ignored benefits are less than the ignored costs.
 
 
 44
 Second, once the Regulatory Impact Analysis raised the issue, it dismissed it as speculative--"This is not directly addressed by this study because of great uncertainty about how many mines would be affected." II J.A. at 627 n. 3. On its face, this appears a plausible ground, and no one--neither the authors of the Regulatory Impact Analysis nor, obviously, petitioners--suggested otherwise. Thus, on the precise grounds that the authors of the Regulatory Impact Analysis invoked to dismiss the concern, there was simply no opposition. We once observed that an agency "cannot be expected to make silk purse responses to sow's ear arguments." City of Vernon v. FERC, 845 F.2d 1042, 1047 (D.C.Cir.1988). Similarly, a zero argument deserves a zero response. It makes no difference whether this is simply an application of Vernon's sow's ear principle or a kind of micro application of exhaustion.
 
 
 45
 There are two branches to petitioners' attack on EPA's theory that regulation by the Department of Interior (under the Surface Mining Control and Reclamation Act and other authorities) made many of the benefits of listing coal mines redundant, leaving the net cost-benefit evaluation of Alternative IV negative. First, they note that EPA's Clean Air Act authority trumps Interior's as to general control of air quality hazards of mining, unless there is a " 'regulatory gap' in the coverage of [the Clean Air Act]". National Wildlife Federation v. Hodel, 839 F.2d 694, 765 (D.C.Cir.1988); see also SMCRA Sec. 702(a)(4), 30 U.S.C. Sec. 1292(a)(4) (1988). As our conclusion in Hodel that no such regulatory gap existed rested on EPA's being in the process of considering listing surface coal mines, 839 F.2d at 765, and as it has now resolved that in the negative, the premise for any limit on Interior's jurisdiction no longer applies. Moreover, Hodel's finding of preemption was extremely limited, and did not encompass the Interior regulations on which EPA now relies. Id. EPA's action is simply a recognition that many of the benefits of listing can be achieved by Interior under SMCRA, not, as petitioners see it, a "deferral in favor of SMCRA contraven[ing] congressional intent." Petitioners' Brief at 29.
 
 
 46
 Second, petitioners argue that Interior's authority to regulate fugitive emissions from surface coal mines is an imperfect substitute for PSD regulation by EPA. But EPA never claimed that Interior's SMCRA regulation was a clone of listing for PSD purposes. It merely found that Interior's programs would "provide benefits equivalent to Alternative IV through the mitigation or prevention of adverse effects on air quality related values in national parks and other areas of special concern, ... assuming a roughly similar mix of pollution control measures, reductions in SCM size, and SCM relocations as was assumed would accompany Alternative IV." 54 Fed.Reg. at 48,879/3 (emphasis added). Thus, EPA reasoned, a significant portion of the benefits that the Regulatory Impact Analysis attributed to Alternative IV were phantom benefits. With them removed, the cost-benefit analysis of Alternative IV (which came out inconclusively balanced) would come out decidedly negative. Id. at 48,878/3.
 
 
 47
 That conclusion hardly seems arbitrary or capricious. By virtue of SMRCA, surface coal mining is forbidden in some areas, subject to Interior's veto in others, and everywhere subject to Interior regulation for air quality purposes, restrictions that EPA reviewed in considerable detail. 54 Fed.Reg. at 48,674/1-75/2.
 
 
 48
 Prohibition. Section 522(e)(1), 30 U.S.C. Sec. 1272(e)(1) (1988), prohibits surface coal mining within the boundaries of mandatory Class I and Class II areas.[6] Further, Sec. 522(e)(3) prohibits, subject to valid existing rights, surface coal mining that will "adversely affect" these areas, unless the mining is approved jointly by Interior and the federal, state or local agency with jurisdiction over the park.[7]
 
 
 49
 Veto authority. Section 522(c) allows any person whose interests may be adversely affected by surface coal mining to petition the regulatory authority to have any area designated as unsuitable for mining, and the grounds on which the petition may be granted include a showing that the operations will "affect fragile or historic lands in which such operations could result in significant damage to important historic, cultural, scientific, and esthetic values and natural systems", see Sec. 522(a)(3)(B), 30 U.S.C. Sec. 1272(a)(3)(B) (1988), which Interior interprets to include areas of recreational value due to high environmental quality, critical habitats for threatened species and uncommon geologic formations, 30 CFR Sec. 762.5 (1990).
 
 
 50
 Controls. SMCRA provides Interior authority to require mine operators to "stabilize and protect all surface areas ... to effectively control erosion and attendant air and water pollution." Sec. 515(b)(4), 30 U.S.C. Sec. 1265(b)(4) (1988); see also Sec. 515(b)(17), 30 U.S.C. Sec. 1265(b)(17) (1988). Under this authority, Interior has promulgated extensive regulations, requiring, for example, that all surface coal mining permit applications include a plan for fugitive dust control and an air quality monitoring program to evaluate its effectiveness. 30 CFR Sec. 780.15 (1990). In addition, haul roads must be located, designed, constructed, used, maintained, and reclaimed so as to "[c]ontrol or prevent erosion ..., including road dust as well as dust occurring on other exposed surfaces, by measures such as vegetating, watering, using chemicals or other dust suppressants." Id. Sec. 816.150(b)(1).
 
 
 51
 Finally, EPA relied on the Bureau of Land Management's authority over coal mining on federal lands (exercised primarily through lease requirements), noting that 80% of western coal reserves are located on federal lands. See 54 Fed.Reg. at 48,675/1. Areas of outstanding scenic quality are considered unsuitable for leasing unless the BLM determines that "mining operations will not significantly diminish or adversely affect the scenic quality of the designated area". 43 CFR Sec. 3461.5(e)(2) (1990).
 
 
 52
 Thus we find that EPA was not arbitrary or capricious in its decision not to list surface coal mines on the basis of its projection of the effects of the prohibitions and regulations that Interior will enforce. EPA recognized, however, that its projection might prove incorrect, and committed itself to reconsider listing surface coal mines on evidence that Interior "will not protect visibility and other air quality values" in "national parks, wilderness areas, national memorial parks, and international parks that are Class I PSD areas." 54 Fed.Reg. at 48,870/3. Presumably it will do so on such a showing by petitioners.
 
 
 53
 * * *
 
 The petitions for review are
 
 54
 Denied.
 
 
 
 [1]
 "Fugitive emissions" are air pollution which is emitted to the atmosphere without passing through a smokestack or other centralized emission point. 40 CFR Sec. 52.21(b) (1990)
 
 
 [2]
 For examples of its use elsewhere, see Sec. 172(b)(6), 42 U.S.C. Sec. 7502(b)(6) (1988); Sec. 120, 42 U.S.C. Sec. 7420 (1988)
 
 
 [3]
 In order to obtain a PSD permit an applicant proposing a new or modified "major" source must demonstrate that the proposed source will not cause ambient pollution concentrations to rise above the statutorily specified "increment". Once the PSD baseline date is triggered by the first PSD permit application in the area, all increases in actual emissions consume the permissible amount regardless of their source. See Alabama Power, 636 F.2d at 361-64
 
 
 [4]
 See House Report at 8-9, U.S.Code Cong. & Admin.News 1977, pp. 1085, 1086; reprinted in 4 Leg. Hist. at 2475-76
 
 
 [5]
 See 42 U.S.C. Sec. 7607(d)(7)(B) (1988) ("[o]nly an objection to a rule or procedure which was raised with reasonable specificity during the period for public comment ... may be raised during judicial review"); NRDC v. Thomas, 805 F.2d 410, 427 (D.C.Cir.1986). The parties contest whether this provision is applicable, or only common law exhaustion. On the view we take of the case, it makes no difference
 
 
 [6]
 Subject to valid rights existing on August 3, 1977, Sec. 522(e)(1) prohibits mining in National Park Systems, the National Wildlife Refuge System, the National System of Trails, the National Wilderness Preservation System, the Wild and Scenic Rivers System, and National Recreation Areas. This overlaps completely with PSD mandatory Class I areas and appears to cover all mandatory Class II areas except national lakeshores and seashores
 
 
 [7]
 Section 522(e)(3) applies to "publicly owned parks". Interior defines the term broadly as any area dedicated or designated by any governmental agency primarily for public recreational use, 30 CFR Sec. 761.5 (1990), a definition it says covers mandatory Class I and Class II areas, see II J.A. at 526, clarifying an earlier statement (48 Fed.Reg. at 41,319/1 (1983)) that might have been read to deny Sec. 522(e)(3) protection for National Parks. In its comments to EPA in this rulemaking, Interior assured EPA that "adverse effects" include "impacts to air quality and related values". II J.A. at 527